UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
KAYI K.  AFANOU,

                          Plaintiff,                          15-cv-3436 (PKC)

          -against-                                           MEMORANDUM
                                                              AND ORDER

COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

          Plaintiff Kayi K. Afanou, proceeding pro se, seeks judicial review of a final

decision by the Commissioner of Social Security (the "Commissioner") that denied her

application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42

U.S.C. § 401 et seq., and Supplemental Security Income ("SSI") under Title XVI of the Act, 42

U.S.C. 1381 et seq.  Plaintiff contends that the decision of the Administrative Law Judge

("ALJ") was erroneous, not supported by substantial evidence, and contrary to law.  Defendant

has moved for judgment on the pleadings under Rule 12(c), Fed. R. Civ. P.  (Dkt. No. 19.)  For

the reasons set forth below, defendant's motion is granted.


I. PROCEDURAL HISTORY

          Plaintiff applied to the Social Security Administration ("SSA") for DIB and SSI

on February 21, 2012, alleging disability due to lumbosacral neuritis, depression, and abdominal

pain beginning on December 31, 2010.[1]  (R. 179-89.)  The SSA initially denied plaintiff's claim

on April 18, 2012.  (R. 179-89.)  Plaintiff then requested a hearing with an ALJ.  (R. 192-94.)

_____

[1] Citations to "(R._.)" refer to the certified copy of the administrative record of proceedings filed by the
Commissioner as part of her answer.

ALJ Hilton R. Miller held a hearing on October 7, 2013, before whom plaintiff, her attorney, and a vocational expert appeared.  (R. 30-50.)  On November 15, 2013, the ALJ issued an opinion denying plaintiff's claim.  (R. 11-29.)

Plaintiff requested that the SSA Appeals Council review the ALJ's decision.  (R. 1-6.)  In support of her request, plaintiff provided additional medical records spanning from December 12, 2013 through August 20, 2014.  (R. 60-165.)  On March 13, 2015, the Appeals Council denied plaintiff's request to review the ALJ's decision, rendering the ALJ Miller's opinion the final decision of the Commissioner on March 11, 2014.  (R. 1-6.)  The Appeals Council reasoned that the new information plaintiff submitted did not provide a basis for changing the ALJ's decision because it related to a later time period, and, therefore, did "not affect the decision of whether [plaintiff was] disabled beginning on or before November 15, 2013."  (R. 2.)

Proceeding pro se, plaintiff filed a timely action with this Court seeking review of the Commissioner's decision.  (Dkt. No. 2.)  Defendant has moved for judgment on the pleadings. (Dkt. No. 19.)

## II. EVIDENCE BEFORE THE ALJ

### a.  Plaintiff's Background and Testimony

Plaintiff was born on March 7, 1969.  (R. 24.)  She was 41 years old on the alleged disability onset date, and 44 at the time of the ALJ's decision.  (R. 300.) She completed school through the twelfth grade and received training to work as home attendant.  (R.306-07.) Plaintiff had worked as a cashier in a clothing store, a self-employed hair braider, and a home attendant for a health care agency.  (R. 307.)  Her job as a cashier involved lifting less than 10 pounds, walking for one hour, and standing for seven hours per day (R. 336); her job as a hair

braider involved sitting for three hours and standing for five hours per day (R. 337); and her job as a home attendant involved walking for two hours per day, standing for seven hours, and sitting for two hours per day.  (R. 338.)

Plaintiff testified that she broke her back after falling on subway stairs and as a result experiences pain in her knees and back.  (R. 20, 33.)  The accident occured in late December 2010.  (R. 430-35.) Plaintiff reported receiving four injections for her pain from her doctor.  (R. 37.)  Plaintiff felt relief from these injections for approximately ten months to a year, however, afterwards the pain returned.  (R. 37.)  Plaintiff's doctor also prescribed medication, which reportedly sometimes decreased the pain, but did not completely alleviate it.  (R. 33.)  At the time of the ALJ hearing, plaintiff was advised by her doctor to continue with the medication for four months, and to consider surgery if the pain persisted.  (R. 38.)

At the time of the hearing, she lived with her two daughters, an eight-year-old and a twenty-four-year-old.  (R. 36.)  She cares for her eight-year-old daughter by cooking for her, preparing her for school, and picking her up from school.  (R. 323.)  Plaintiff receives assistance from her older daughter in caring for the eight-year-old when plaintiff is unable to care for her due to her pain. (R 323.)  Plaintiff's daily activities include talking on the phone, watching television, reading, and caring for her youngest daughter.  (R. 323).  Plaintiff performs household chores such as light cleaning, laundry and grocery shopping.  (R. 325.)  Plaintiff cooks one to two times per week but cannot stand for long periods of time while cooking due to pain. (R. 325.)  During her testimony, plaintiff reported needing to lie down two to three times per day if she is experiencing pain.  (R. 35.)  Plaintiff also sits down to bathe and dress herself because of pain.  (R. 37.)  She leaves her house about four to five times per week and walks or uses public transportation. (R. 325.)  However, plaintiff reported she can only walk about four blocks at a

time.  (R. 328.)  Plaintiff's ability to manage money has not changed since the onset of her

alleged disability.  (R. 326.)  In her testimony in front of the ALJ, she reported using a cane for

the past two years.  (R. 34-35.)  For social activities, plaintiff visits friends and attends church.

(R. 327, 332.)

Plaintiff reported the ability to concentrate unless the pain was unbearable.  (R.

329.)  She occasionally needs to take intermittent rest to finish assignments.  (R. 329.).  Plaintiff

reported no issues getting along with authority figures.  (R.329.)  She copes with stress through

prayer, although she reported stress causes her to stay in bed longer.  (R. 330.)

b.  Medical Evidence

i.  Medical Evidence before Relevant Period (December 31, 2010)

Medical evidence contained in the administrative record pertaining to plaintiff's

health before the alleged disability onset include a normal computed tomography (CT) scan of

the brain on January 14, 2009 (R. 478); an emergency room treatment for a migraine (R. 436-

41); a routine general medicine examination by Dr. Adenike Adeyemo in November and

December 2010 (R. 385-87, 536-48); and a gynecological exam  by Dr. Serge Nazon in

November 2010.  (R. 510-11.)

On December 27, 2010, plaintiff visited the Lincoln Medical and Mental Health

Center Emergency Department, reporting back pain radiating to her abdomen after slipping on

subway stairs the previous day.  (R. 430-35, 442-43, 788-89.)  She described her level of pain as

4 on a scale of 1 to 10 (R. 432.) An X-ray revealed no fractures or evidence of dislocation, bones

in were in good alignment, and plaintiff had normal joint space.  (R. 432-33. 941-42.) Plaintiff

was noted to be independent in daily living.  (R.788.)  Doctors discharged patient with

instructions to ice the area and take Motrin.  (R. 442.)

>  ii.  Medical Evidence During Relevant Period (December 31, 2010 –
>        November 15, 2013)

>  a.  Treating Physicians

On January 5, 2011 plaintiff visited Morrisania Diagnostics and Treatment Center

seeking treatment for residual pain in her lower back, buttocks, and tailbone area.  (R. 382-83.)

Plaintiff reported trouble sitting for long without pain, and that the pain sometimes radiated

down her legs.  (R. 383.)  An MRI revealed degenerative disc desiccation and mild loss of height

at L4-5; a small disc bulge with a superimposed left foraminal disc protrusion at L4-L5 resulting

in mild canal stenosis and moderate left foraminal narrowing; and fat-containing paranumbilical

hernia.  (R. 383, 940.)  An X-ray on January 6, 2011 showed a nondisplaced traverse linear

fracture in the SF segment with no evidence of joint dislocation, and impacted compression

healing in the first coccygeal segment.  (R. 388.)

On January 11, plaintiff visited Dr. Jose Torres-Gluck of the Lincoln

neurosurgery clinic.  (R. 426-29.)  Plaintiff complained of back pain that radiated to the right

lower extremity, and reported being able to walk only four blocks without rest.  (R. 427.)  Dr.

Torres-Gluck noted her MRI revealed degenerative disc disease (DDD).  (R. 427.)  His

examination found plaintiff exhibited full motor strength.  (R. 427.)  The doctor noted plaintiff

had poor compliance with the conservative pain management, and he mentioned the possibility

of surgical correction.  (R. 428.)  Dr. Torres-Gluck referred the plaintiff to physical therapy and

pain management.  (R. 428.)

On February 11, 2011, plaintiff began physical therapy at Lincoln.  (R. 800-06.)
Plaintiff reported she was independent in all activities of daily living and self-care.  (R. 800.)
The physical therapy records show plaintiff had normal gait and intact fine motor skills both on
the left and right sides.  (R. 800.)  The doctors instructed plaintiff to attend physical therapy
twice per week with a goal to decrease pain and increase mobility.  (R. 801.)  On March, 16,
2011, plaintiff visited Dr. Timur Hanan at Lincoln and reported that physical therapy provided
her with little help.  (R. 767.)  She reported pain at a level six out of ten, and could only walk
three blocks.  (R. 767.)   The doctor recommended for plaintiff to continue with pain medication
and physical therapy, and also referred her to neuroradiology for an injection.  (R. 767.)

On April 1, 2011, plaintiff received her first epidural steroid injection from Dr.
Manachem Gold at the Lincoln Interventional Radiology Clinic.  (R. 479.)  The following day,
plaintiff reported to the Lincoln Pain Management Clinic and saw Dr. James O'Connell.  (R.
754.)  Plaintiff reported experiencing back pain that "comes and goes," and that worsened with
standing, walking or sitting for a long time.  (R. 754.)  Plaintiff reported no benefit from the
epidural steroid injection.  (R. 754.)  Dr. O'Connell prescribed topical medications and suggested
facet injection therapy if pain persisted.  (R. 755.)

On April 12, 2011, plaintiff had a follow up visit at Lincoln Neurosurgery.  (R.
749-52).  During her visit, plaintiff noted her leg pain improved since the injection.  (R. 750.)
However, her back pain persisted and varied in intensity, sometimes severe and sometimes mild.
(R. 750.)  Plaintiff planned to continue with conservative pain management and stated she was
not interested in surgery.  (R. 751.)

At a physical therapy session on April 21, 2011, plaintiff reported pain of three
out of ten. (R. 833-34.) However, she was noted as not complaint with home exercises. (R. 833.)

6

On May 3, 2011, plaintiff returned to Dr. Gold for follow up and reported an improvement in her pain after the April injection (from a level of eight out of ten to five out of ten).  (R. 746-48.)  She could walk five blocks and indicated "overall happ[iness] with the results" of the injection.  (R. 746-48.)

Plaintiff continued with physical therapy May through July 2011.  (R. 835-40, 846-47, 856-57, 879-81).  On a doctor's visit on May 18, 2011, plaintiff reported a lower pain level (three out of ten) from the combination of the injection and physical therapy.  (R. 743-45.)

On June 10, 2011, plaintiff received a second epidural steroid injection after reporting the effects of the first injection had worn off.  (R. 738-39, 841-45.)  Two days later, plaintiff reported feeling no pain.  (R. 855.)  On June 14, plaintiff visited Dr. Adeyemo for primary care follow up.  (R. 379-81.)  At this visit, plaintiff reported she still experienced intermittent lower back pain, and she could not sit, stand, or walk for long periods of time.  (R. 380.)  She reported having "good days and bad days" and on that particular day she experienced minimal back pain.  (R. 380.) The doctor continued plaintiff on her medications and physical therapy, requested a follow up with neurosurgery, and suggested plaintiff consider surgery if she failed to see improvement in her condition.  (R. 381.)

On July 7, 2011, Dr. O'Connell performed a bilateral L4-L5 facet joint block, immediately after which plaintiff reported a "dramatic" reduction in her lower back pain after the procedure.  (R. 467-72.)  In a follow up visit on July 27, plaintiff reported continued pain relief but also some torso tenderness in the L3-5 area. (R. 722-24.)  Dr. O'Connell continued plaintiff on the same medications and offered additional injections if necessary.  (R. 723-34.)

Plaintiff returned to the pain clinic on August 5, 2011.  (R.407.)  She reported a sixty to seventy percent reduction in knee and leg pain, but also reported her back pain returned.

(R. 407.)  An examination revealed plaintiff had full motor strength, grossly normal neurological findings, and normal tone and gait.  (R. 717.)

On September 29, 2011, Dr. O'Connell performed facet joint block therapy on the plaintiff and recorded a "dramatic" decrease in post-operative pain.  (R. 448-52.)  In a follow up visit on October 14, plaintiff reported excellent post-procedure relief.  (R. 403-05.)  Dr. O'Connell noted four presacral trigger points on the plaintiff and administered four injections at these trigger points.  (R. 405).  He instructed her to return for a follow up in three months.  (R. 405.)

On December 22, 2011, plaintiff visited Dr. O'Connell again and received a right L5-S1 selective root nerve block.  (R. 396, 457-62, 620-35, 907-17.)  On January 13, 2012 plaintiff returned to the pain clinic reporting she was "very happy and contented," that she experienced a sixty percent reduction in pain, and that the radiation in her leg was "minimal and less frequent."  (R. 687.)  Examination of the plaintiff revealed a mild muscle spasm to the bilateral paravertebral lumbosacral muscles, but also normal gait and balance, full motor strength, and normal neurological findings.  (R. 686-87.)

On March 5, 2012, plaintiff returned to for follow up to the Lincoln Rehabilitation Clinic and saw Dr. Peter Kaganowicz.  Plaintiff reported pain at a three out of ten.  (R. 398.)  She reported her pain improved with medication but worsened after sitting for long periods of time. (R. 398).  Plaintiff had mild tenderness of the lumbosacral spine, trunk flexion of ninety degrees, and she reported radiating pain to her lower right extremity.  (R. 398.)  She could walk on her heels and toes.  (R. 398).  Plaintiff denied any sensory complaints and reported independence in all activities of daily living and self-care.  (R. 398).   Dr. Kaganowicz told plaintiff to continue her home exercise program and prescribed her a heating pad.  (R. 398).

A form completed on May 17, 2012 by a physician[2] at Morrisania indicated the plaintiff was seen at the clinic on May 5, 2012 for lower back and neck pain.  (R. 533).  The form listed her diagnosis as post fall with multilevel cervical / lumbar herniated disc disorder.  (R. 533.)  The physician who completed the form checked a box indicating that the plaintiff was "unemployable."  (R.533.)

On May 19, 2012, plaintiff went to the Lincoln Emergency Department, complaining of increased pain in both legs in the three days prior to her visit.  (R. 680-81, 920-21.)  Plaintiff ran out of her gel medications and described pain as a "pins and needles sensation."  (R. 921.)  Plaintiff reported tenderness in her lumbosacral spine.  (R. 921.)  She demonstrated full strength (five out of five).  (R. 921.)  The doctor prescribed Gabapentin and Cyclobenzaprine and instructed her to follow up with the pain clinic.  (R. 922.)

Plaintiff returned to the pain clinic for follow up on June 20, 2012.  (R. 677-79).  She reported receiving four months of pain relief from her last epidural steroid injection on December 22, 2011.  (R. 679.)  Upon examination, plaintiff was not in acute distress but exhibited bilateral paravertebral tenderness.  (R. 678.)  She demonstrated full motor strength (five out of five), grossly normal nerves, and normal tone, gait, and balance.  (R. 678.)  The doctor instructed plaintiff to continue applying the prescription gels and continue with home exercises.  (R. 679.)  The doctor also prescribed an increased dose of Neurontin, as well a muscle relaxant.  (R. 679).

---

[2] The physician's signature is illegible. The plaintiff's former counsel and the ALJ did not identify the physician who completed the form but the signature does not seem to match any physicians the plaintiff had previously seen at Morrisania.

On August 15, 2012, plaintiff returned to Dr. O'Connell for follow up complaining of a muscle spasm. (R. 674-76.) The doctor observed a spasm in the upper trapezium and prescribed a trial of new medication. (R. 675-76.)

On August 26, 2012, plaintiff returned to the Lincoln Emergency Department with complaints of moderate pain in her back and neck (five out of ten.) Upon examination, plaintiff could move all extremities. (R. 925.) The doctor prescribed Naproxen and discharged her. (R. 926.)

Plaintiff saw Dr. Samina Ashraf at the Lincoln Primary Care Clinic on September 24, 2012. (R. 669-71.) Plaintiff complained of joint pain, backache, muscle cramps and spasms. (R. 669.) Dr. Ashraf reported plaintiff was not in acute distress. (R. 670). Plaintiff reported feeling depressed sometimes because of her back pain. (R. 670.) Dr. Ashraf referred plaintiff to a depression group. (R. 670.) The doctor noted that plaintiff met with neurosurgery but refused any operations. (R. 670.)

On November 9, 2012, plaintiff returned to the Lincoln Pain Clinic. (R. 1008-10.) The nurse practitioner reported plaintiff experienced pain relief for almost a full year as a result of her epidural steroid injection. (R. 1010.) However, the plaintiff's pain was increasing in intensity and she requested another steroid injection. (R. 1010.) Upon examination, the plaintiff demonstrated full motor strength (five out of five), and normal gait and balance. (R. 1009.)

Plaintiff returned to Dr. Ashraf on December 10, 2012, for a pre-operative evaluation before her fourth injection. (R. 1007.) Plaintiff reported pain at five out of ten. (R. 1007.) Dr. Ashraf instructed plaintiff to follow up with the pain clinic in four months. (R. 1007.)

On December 13, 2012, plaintiff received another epidural steroid injection from Dr. George Trister.  (R. 996-1002.)  The doctor diagnosed plaintiff with thoracic or lumbosacral neuritis or radiculitis.  (R. 1002.)  Dr. Trister instructed plaintiff to return to the pain clinic within two weeks for a final decision regarding selective nerve fluid block treatment or radiofrequency ablation.  ( R. 998.)

On December 28, 2012, plaintiff returned to the pain clinic for follow up.  (R. 993-995.)  She reported experiencing no pain since her last injection and had no spinal tenderness.  (R. 995).  Plaintiff also reported the ability to walk longer distances and complete some home chores.  (R. 995.)  Plaintiff demonstrated full motor strength (five out of five), normal deep tendon reflexes, normal gait and balance, and grossly normal sensation.  (R. 993.)  The nurse practitioner advised plaintiff to continue with her medications and return in four months.  (R. 995.)

Plaintiff returned to the pain clinic on May 1, 2013.  (R. 1040-42.)  She reported that her pain was controlled since her last procedure.  (R.1042.)  Plaintiff also stated she experienced off and on pain while sitting for extended period of time, and that the pain radiated to the lower extremity but in lesser frequency.  (R. 1042.)  Overall, the plaintiff reported she was "happy w[ith] improvement in her function."  (R. 1042.)  The nurse practitioner also recorded that plaintiff exhibited normal gait and balance, and no muscle spasms.  (R. 1042.)  Since plaintiff's pain was controlled, the nurse practitioner switched her medication from Tramadol to a Relafen (a non-steroidal anti-inflammatory), and continued plaintiff on Lidocaine ointment and Neurontin.  (R. 1042.)  The nurse practitioner advised plaintiff to come back for follow up in four months.  (R. 1042.)

On July 1, 2013, Dr. Ashraf, plaintiff's treating physician, completed a form entitled "Multiple Impairment Questionnaire." (R. 1031-38.) Dr. Ashraf reported that her first treatment with the plaintiff occurred on September 24, 2012 and her most recent treatment occurred on April 7, 2013. (R. 1031.) Dr. Ashraf diagnosed plaintiff's condition as chronic low back pain with a stable prognosis. (R. 1031.) Dr. Ashraf described plaintiff's pain as sharp, radiating pain that reached her lower extremities and which occurred at unknown frequency. (R. 1032-33.) Dr. Ashraf listed prolonged sitting or standing as a precipitating factor leading to the pain. (R. 1033.) However, the doctor stated that plaintiff's pain was "much improved" and at a two out of ten. (R. 1032.) The doctor concluded this was reasonably consistent with the patient's impairments. (R. 1032.) The doctor listed that plaintiff denied feeling any fatigue. (R. 1033.)

Dr. Ashraf declined to assess for how many hours, during an eight-hour day competitive work day, plaintiff could sit, stand, or walk. (R. 1033.) However, Dr. Ashraf reported that it would be medically necessary for plaintiff not to sit continuously in a work setting, and that she would need to get up and move around every one to two hours. (R. 1033.) The doctor also noted that it would be necessary for plaintiff not to stand or walk continuously in a work setting. (R. 1034.) Dr. Ashraf reported that the plaintiff could never lift or carry over fifty pounds, but that she had no significant limitations in reaching, handling, fingering, or lifting. (R.1034.) Dr. Ashraf reported that plaintiff's experience of pain, fatigue, or other symptoms were severe enough to "frequently" interfere with plaintiff's attention and concentration. (R. 1036.) Dr. Ashraf opined that plaintiff's impairments would most likely last at least twelve months. (R. 1036.)

Dr. Ashraf also reported that plaintiff is not affected by emotional factors and she was not a malingerer. (R. 1036.) The doctor declined to assess plaintiff's ability to tolerate work stress. (R. 1036.) Dr. Ashraf opined that plaintiff would need to frequently take breaks during an eight-hour workday. (R. 1036.) Ashraf also reported that plaintiff's impairments would likely produce "good days" and "bad days," and that as a result plaintiff would likely miss work more than three times a month. (R. 1037.) Dr. Ashraf reported that plaintiff was "substantially improving," and should come for re-evaluation in one year. (R. 1037.)

On September 23, 2013, Dr. Ashraf completed a second questionnaire pertaining to plaintiff's impairments. (R. 1067.) Dr. Ashraf listed the date of her first treatment as occurring in April 2012, and her most recent exam as occurring on September 2013. (R. 1067.) Dr. Ashraf reported seeing the plaintiff every six months. (R. 1067.) The doctor listed plaintiff's diagnosis as lumbar radiculopathy, sickle cell disease, and migraine and she indicated she expected plaintiff's ongoing impairments to last at least twelve months. (R. 1067.) Dr. Ashraf listed plaintiff's primary symptom as right lower extremity pain and that such pain was aggravated by excessive walking, standing, and sitting. (R. 1068.)

Dr. Ashraf opined that in an eight-hour work day, plaintiff could perform a job in a seated position for two hours, and could walk or stand for two hours (for a total of four hours combined). (R. 1069.) She also stated plaintiff needed to alternate from a seated position every one to two hours and then should refrain from sitting down again for another one to two hours. (R. 1069.) The doctor declined to assess plaintiff's ability to lift or carry various weights. (R. 1069.)

b.   Consultative Examinations

On April 10, 2012, David Mahony, Ph.D. performed a consultative psychiatric evaluation of the plaintiff at the request of the SSA.  (R. 482-485.)  During the evaluation, plaintiff denied any psychological, emotional, or behavioral problems, she denied any symptoms of depression, and she reported taking Trazodone medication.  (R. 482). Plaintiff reported dressing, bathing, and grooming herself, as well as performing cleaning and shopping.  (R. 484.) Dr. Mahony concluded the plaintiff had no cognitive, emotional, behavioral, or substance abuse problems.  (R. 484.)

On April 16, 2012, plaintiff met with State agency psychiatric consultant Dr. M. Apacible who concluded plaintiff did not have a severe mental impairment.  (R. 486-99).

On September 9, 2013, plaintiff met with Fredelyn Engelberg Damari, Ph.D. for a psychiatric consultative evaluation at the request of the commissioner.  (R. 1045-1052.) Plaintiff reported travelling to the appointment by subway but had trouble with the stairs because of her bad back.  (R. 1045.)  During the evaluation, plaintiff told Dr. Damari she left her previous job as a home attendant because of back pain but she wanted to work and hoped to find another job. (R. 1045.)

Dr. Damari reported plaintiff denied depression, anxiety, panic attacks, manic symptomology, thought disorder symptoms or cognitive deficits. (R. 1046.)  Plaintiff told Dr. Damari she dressed, bathed, and groomed herself, though she did so slowly. (R. 1047.)  The plaintiff reported experiencing difficulty cooking because her feet hurt. (R. 1047.) Plaintiff also stated her daughter helped her with cleaning and laundry. (R. 1047.)  Plaintiff reported managing her money and using public transportation. (R. 1047.)  She stated she socialized with friends and maintained good relationships with her family. (R. 1047-48.)  Dr. Damari found that plaintiff had

14

mild impairments in concentration and memory, but had good insight and judgment. (R. 1047.) The doctor also found plaintiff was able to understand simple directions and perform simple tasks independently. (R. 1048.) Dr. Damari assessed plaintiff's adjustment disorder with depressed mood and found the prognosis was good. (R. 1048.) Generally, Dr. Damari concluded the results of the examination appeared consistent with stress-related problems but this, in itself, was not "significant enough to interfere with the claimant's ability to function on a daily basis." (R. 1048.)

On September 11, 2013, plaintiff saw Dr. Sharon Revan for a consultative internal medicine examination. (R. 1053-63.) Dr. Revan reported plaintiff experienced low back pain for the past three years after falling down the subway stairs. (R. 1053). Plaintiff stated her sharp pain improved with medicines but worsened after walking four to five blocks, standing for long, and lying down. (R. 1053). During the exam, plaintiff reported experiencing pain at a level eight out of ten. (R. 1053.) Plaintiff reported showering and dressing herself, and receiving assistance with cooking, cleaning, and laundry, and shopping from her daughters due to her back pain. (R. 1054.) Dr. Revan reported claimant had normal gait and the ability to walk on heels and toes without difficulty. (R. 1054). She moved on and off the exam table without any assistance. (R. 1054.) Plaintiff was able to rise from her chair without difficulty. (R. 1054.) Upon examination, Dr. Revan reported plaintiff had full lateral and bilateral spine flexion. (R. 1055.) Plaintiff had full bilateral grip strength and no noted sensory deficit. (R. 1055.) Dr. Revan diagnosed plaintiff with low back pain with a fair prognosis. (R. 1055.) The doctor concluded claimant had no limitations with the upper extremities for the fine or gross motor activity. (R. 1055.) She had mild limitations for walking, sitting, climbing stairs, and standing

due to back pain.  (R. 1055.)  Plaintiff had moderate limitations to activities of daily living

secondary to back pain, but she had no limitations to personal grooming.  (R. 1055.)

Dr. Revan stated plaintiff could occasionally lift up to twenty pounds.  (R. 1058.)

The doctor opined that plaintiff could sit, stand, and walk each for thirty minutes at a time

without interruption, and could sit, stand, and walk for up to two hours each (for a total of six

hours combined) during an eight-hour work day.  (R. 1059.)  Dr. Revan failed to properly answer

what activity plaintiff would do during the two hours that are unaccounted for in the eight-hour

work day if plaintiff is not sitting, standing, or walking.  (R. 1055.)  Dr. Revan reported the

plaintiff walked without an assistive device.  (R. 1055.)  The doctor opined plaintiff could

continuously do the following activities with her hands: reaching, handling, fingering, feeling,

pushing, and pulling. (R. 1055.)  Dr. Revan also opined plaintiff could continuously operate foot

controls.  (R. 1055.)  Dr. Revan reported the plaintiff could occasionally climb stairs and ladders,

but could never stoop, kneel, or crouch.  (R. 1055.)  Finally, Dr. Revan opined plaintiff could go

shopping, travel without a companion, and use public transportation.  (R. 1055.)

Dr. Revan reported plaintiff had no significant limitations in reaching, handling,

or fingering.  (R. 1070).  However, she also stated plaintiff had a marked limitation in grasping

and using hands and fingers for fine manipulation.  (R. 1070.)  Dr. Revan opined plaintiff's

symptoms would likely increase if plaintiff worked in a competitive work environment due to the

stress of sitting or standing for long hours, and that occasionally plaintiff's symptoms would be

severe enough to interfere with her attention and concentration.  (R. 1070.)  The doctor stated

plaintiff would need to take unscheduled breaks every one to two hours during an eight-hour

workday and would likely be absent more than three times a month as a result of her

impairments.  (R. 1070-71.)

Dr. Revan did not believe plaintiff had emotional factors that contributed to the severity of patient's symptoms.  (R. 1055.)  Finally, Dr. Revan noted plaintiff would return to the pain clinic and neurology for re-evaluation, and that she would re-evaluate the plaintiff in one year.  (R. 1071.)

   iii. <u>Medical Evidence Submitted After Relevant Time Period</u>

Before the Appeals Council's decision, plaintiff submitted medical records from the time after the ALJ's decision on November 15, 2013 through August 2014. (R. 60-165). These records included an MRI from January 7, 2014 that revealed a disc herniation at L5-S1 that had not previously appeared on any other MRIs. (R. 149.)  The medical records show plaintiff underwent surgery on February 21, 2014 to correct this herniation. (R. 76-77.)

c.  <u>Vocational Expert Testimony</u>

Vocational expert, Peter Manzi, testified before before the ALJ. (R. 39-50.) The ALJ asked Mr. Manzi to consider a hypothetical person with the plaintiff's age, education, and work experience, and with the following abilities or limitations: capacity to lift or carry up to twenty pounds occasionally and ten pounds frequently; the ability to stand, walk or sit with normal breaks for a total of six hours in an eight-hour workday; the ability to occasionally climb ramps or stairs; the inability to use ladders, ropes, scaffolding, foot controls and foot pedals; the ability to occasionally balance, kneel, stoop, crouch or crawl; and the ability to alternate positions every thirty minutes. (R. 40.)  The ALJ included that the hypothetical person could perform simple, routine, and repetitive tasks, and some moderately complex tasks that could be explained, specifically SVP: 1 and 3 which involve making simple decisions and occasional change of routines.  (R. 40.)  With these parameters in mind, the ALJ asked Mr. Manzi if the hypothetical person described could find any jobs in the national economy.  (R. 40.)

Mr. Manzi responded that such a person could perform plaintiff's past job as a cashier.  (R. 40.)  He also identified several other positions, all classified as light work, that the hypothetical person could perform: collator operator (Dictionary of Occupational Titles "DOT" Code 208.685-010) with 44,148 jobs existing nationally and 1,700 existing regionally; laundry sorter (DOT code: 361.687-014) with 129,000 jobs nationally and 2,500 regionally; and photocopy machine operator (DOT code: 207.685-014) with 1,200 regionally.[3]  (R. 42.)  Mr. Manzi also testified that these jobs would allow a person to alternate positions every thirty minutes. (R. 44.)

---

[3] The vocational expert's testimony regarding the number of national existing photocopy machine operator jobs was inaudible.

Mr. Manzi responded to a number of other hypotheticals including that if the hypothetical person of the plaintiff's age, education, and previous work experience would be absent more than three times a month due to impairments or treatments, then that person would be precluded from all work. (R. 43). He also stated that if the hypothetical person could only sit for two hours and walk or stand for two hours during an eight-hour workday, then that person could not find employment.  (R. 42-23.)

## III. APPLICABLE LAW

### a.  Standard of Review

Under Rule 12(c), Fed. R. Civ. P., a movant is entitled to judgment on the pleadings only if he or she establishes that, based on the pleadings, he or she is entitled to judgment as a matter of law.  Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. (UPGWA) & Its Local 537, 47 F.3d 14, 16 (2d Cir. 1995).  "Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings."  Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988).

District court review of the Commissioner's final decision denying disability benefits is limited.  A court may not review the Commissioner's decision de novo.  See Cage v. Comm'r of Soc. Servs., 692 F.3d 118, 122 (2d Cir. 2012) (citation omitted).  If the Commissioner's findings are free of legal error and supported by substantial evidence, the court must uphold the decision.  42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied . . . the court shall review only the question of conformity with [the] regulations . . . ."); see also Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008).  A court's

review thus involves two levels of inquiry.  Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999).

First, the court must review "whether the Commissioner applied the correct legal standard," id.,

including adherence to applicable regulations, see Kohler, 546 F.3d at 265.  Second, the court

must decide whether the Commissioner's decision is supported by substantial evidence.  Tejada,

167 F.3d at 773.

An ALJ's "[f]ailure to apply the correct legal standards is grounds for reversal."

Pollard v. Halter, 377 F.3d 183, 189 (2d Cir. 2004) (quoting Townley v. Heckler, 748 F.2d 109,

112 (2d Cir. 1984)).  An ALJ's factual findings supported by substantial evidence are "binding"

on a district court; however, "where an error of law has been made that might have affected the

disposition of the case," the court cannot simply defer to the ALJ's factual findings.  Id.

In a social security case, the phrase "substantial evidence" "means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v.

Perales, 402 U.S. 389, 401 (1971).  It is "a very deferential standard of review – even more so

than the 'clearly erroneous' standard."  Brault v. Comm'r of Social Sec., 683 F.3d 443, 448 (2d

Cir. 2012).  The reviewing court views the evidence as a whole rather than considering evidence

in isolation.  See Talavera, 697 F.3d at 151 (stating that the reviewing court is required to

examine the entire record); see also Tejada, 167 F.3d at 774.  Even if there is substantial

evidence weighing against the Commissioner's position, the Commissioner's determination will

not be disturbed so long as substantial evidence also supports it.  See DeChirico v. Callahan, 134

F.3d 1177, 1182 (2d Cir. 1998) (upholding the Commissioner's decision where there was

substantial evidence for both sides).

"[G]enuine conflicts in the medical evidence are for the Commissioner to resolve." Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (citation omitted). In particular, courts must show special deference to an ALJ's credibility determinations because the ALJ had the opportunity to observe the witnesses' demeanor while testifying. Yellow Freight Sys. Inc. v. Reich, 38 F.3d 76, 81 (2d Cir. 1994); see also Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999).

b.   Five-Step Disability Determination

The Act defines "disability" in relevant part as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Act further specifies that an individual is disabled only if the physical or mental impairments "are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). This is "regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." Id. Work which exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A); see also 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner's determination of a claimant's disability follows a five-step sequential analysis promulgated by the SSA. 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has summarized this analysis as follows:

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (brackets and omission in original)).  The plaintiff bears the burden of proof for the first four steps; the burden shifts to the Commissioner at the fifth step.  See Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000).

"In making his determination by this process, the Commissioner must consider four factors: (1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam) (citation and quotation marks omitted).  Further, the Commissioner "shall consider the combined effect of all the individual's impairments . . . ." 42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

c.  Treating Physician Rule

Under applicable regulations, the opinion of a claimant's treating physician regarding "the nature and severity of [claimant's] impairment[s]" will be given "controlling weight" if it "is well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence in [the] case record."

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Burgess, 537 F.3d at 128 (citations

omitted).  In contrast, a treating physician's opinion is not given controlling weight when the

opinion is inconsistent with other substantial evidence in the record, such as the opinions of other

medical experts.  20 C.F.R. § 404.1527(d)(2); Snell, 177 F.3d at 133.  In such a case, a report

from a consultative physician may constitute substantial evidence.  Mongeur v. Heckler, 722

F.2d 1033, 1039 (2d Cir. 1983).

If the ALJ gives the treating physician's opinion less than controlling weight, he

must provide good reasons for doing so.  Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d

Cir. 1998).  The weight given to a treating physician's opinion is determined by a number of

factors including, inter alia, (i) the frequency of examinations and the length, nature, and extent

of the treatment relationship; (ii) the evidence in support of the physician's opinion; (iii) the

opinion's consistency with the record as a whole; and (iv) whether the physician has a relevant

specialty.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see Clark, 143 F.3d at 118.

The opinion of a treating physician, or any doctor, that the claimant is "disabled"

or "unable to work" is not controlling.  20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).  Medical

opinions on such controlling issues are merely a consideration and not determinative.  20 C.F.R.

§ 404.1527(e).  These are issues reserved to the Commissioner, but that "does not exempt

[the ALJ] from [his] obligation . . . to explain why a treating physician's opinions are not being

credited."  Snell, 177 F.3d at 134.

d.  Evaluating Claimant's Credibility

The Social Security Act provides that "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability . . . ." 42. U.S.C. § 423(d)(5)(A). Rather, the ALJ "may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Genier v. Ashtrue, 606 F.3d 46, 49 (2d Cir. 2010). The ALJ's assessment of the plaintiff's credibility is performed in a two-step analysis of evidence in the record. 20 C.F.R. § 404.1529; Genier, 606 F.3d. at 49. First, the ALJ must determine whether the plaintiff suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged.  Id.  Second, if the plaintiff does suffer from such impairment, "the ALJ must consider the extent to which [the plaintiff's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record."  Id.  Specifically, the ALJ will consider if there are any inconsistencies in the evidence and the extent to which there are any conflicts between the plaintiff's statements and the rest of the evidence. 20 C.F.R. § 404.1529(c)(4). When an ALJ rejects testimony as not credible "the basis for the finding 'must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record.'" Puente v. Commissioner of Social Security, 130 F.Supp. 3d. 881, 894 (S.D.N.Y. 2015) (citing Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260–61 (2d Cir.1988)). However, where an ALJ provides specific reasons for finding the testimony not credible, courts generally give deference to the ALJ on appeal. Puente, 130 F.Supp. at 895.

IV. Discussion

    a.  The ALJ's Findings

        Applying the sequential five-step process for evaluating disability claims, the ALJ found plaintiff not disabled within the meaning of the act and thus denied her benefit claims  (R. 16-25).  First, the ALJ determined that plaintiff had not engaged in substantial gainful activity since December 31, 2010, the alleged onset date of the impairment.  (R. 16; see also 20 C.F.R. §§ 404.1571 et seq., 416.971 et seq.). The ALJ's step one finding was consistent with plaintiff's testimony and her reported earnings.

        Second, the ALJ determined the plaintiff's back disorder qualified as a severe impairment, finding it caused more than a minimal effect on the plaintiff's ability to perform basic work activities.  (R. 16.)  However, the ALJ found the plaintiff's alleged adjustment disorder with depressed mood caused only a minimal limitation in the plaintiff's ability to perform basic mental work activities.  (R. 17.)  The ALJ considered two psychiatric consultative examinations with the plaintiff performed at the behest of the SSA, both of which concluded plaintiff's psychiatric problems were non-severe.  (R. 17.)  Indeed, during both exams, the plaintiff largely denied any psychiatric problems.  (R. 17.)  For these reasons, the ALJ determined plaintiff's psychiatric issues were non-severe.[4]

        Third, the ALJ determined the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (R. 16.)

_____

[4] Plaintiff's initial disability application to the SSA alleged disability to psychiatric problems. (R. 186.) However, plaintiff does not allege disability due to a psychiatric condition in the action before this court.

Fourth, the ALJ determined the plaintiff had the residual functional capacity ("RFC") to perform her past work as a cashier.  (R. 23.) The ALJ found the plaintiff could perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except the claimant can occasionally climb ramp and stairs and balance; she can never climb ladders, ropes, or scaffolds; and the work cannot include foot controls or foot pedals utilizing the bilateral lower extremities. (R. 19.)  Additionally, the ALJ found the claimant can never stoop, kneel, crouch, or crawl.  (R. 19.)  The work must also allow the claimant to alternate position every thirty minutes.  (R. 19.) The ALJ also found that the claimant would be limited to simple, routine, repetitive tasks to some moderately complex tasks that can be explained, specifically SVPs 1 through 3, which involve making simple changes and occasional changes in routine.  (R. 19.)  Relying on the testimony of the vocational expect, the ALJ compared the claimant's RFC with the physical and mental demands of plaintiff's past work as a cashier, and found the plaintiff was able to perform it as actually and generally performed.  (R. 24.)

Finally, although the ALJ concluded the plaintiff had the RFC to perform her past work as a cashier, he alternatively found she could perform other work that existed in significant numbers in the national economy.  (R. 24.)  In so concluding, the ALJ considered plaintiff's age, education, work experience, and RFC, in conjunction with the Medical Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  (R. 24.)  The ALJ also relied on testimony of a vocational expert, who took into account the plaintiff's additional limitations that impeded her ability to perform the full range of light work. (R. 24-25.) The vocational expert testified plaintiff could perform work as (1) a collator operator (DOT code: 208.685-010) SVP-2; (2) a laundry sorter (DOT code: 361.687-014); and (3) a photocopy machine operator (DOT code: 207.685-014).

b.  <u>The Medical Records Support the RFC Finding of the ALJ</u>

The substantial weight of the evidence supports the ALJ's RFC findings, that, as a whole, plaintiff responded well to treatment and had largely unremarkable examinations during the period in question.  (R. 19-21.)  First, plaintiff responded well to the conservative pain management treatments. For example, shortly after receiving her first injection on April 1, 2011, plaintiff reported an improvement in pain (from eight out of ten to five out of ten) and that she was "overall happy with the results" of the injection.  (R. 747.)   Plaintiff reported these improvements even though she did not always comply with her prescribed home exercises. (R. 833.)  Additionally, in a doctor's visit on May 18, 2011, plaintiff stated the combination of physical therapy and the injection reduced her pain to a level three or four out of ten.  (R. 744.) In a doctor's visit after her second injection on June 10, 2011, plaintiff reported experiencing minimal pain.

After the plaintiff received a joint facet block on July 7, 2011, her medical records document that she experienced a "dramatic" reduction in lower back pain.  (R. 469.)  In a follow up visit on July 27, 2011, plaintiff reported continued pain relief. (R. 723.)  Shortly after, in a visit to the pain clinic on August 5, 2011, plaintiff reported a sixty to seventy percent reduction in knee and leg pain.  (R. 407.)

After plaintiff's facet joint block on September 29, 2011, the records again report a "dramatic" decrease in post-operative pain (R. 451), and in a follow up visit on October 14, plaintiff reported excellent post-procedure relief.  (R. 405.)

After plaintiff's selective root nerve block on December 22, 2011, she reported feeling "very happy and contented" and reported experiencing a sixty percent reduction in pain.

(R. 687.)  At a follow up visit in March 2012, plaintiff reported pain at a level of three out of ten. (R. 398.)

In doctors' visits in November and December of 2012, plaintiff reported experiencing no pain since her last injection almost a year before, the ability to walk longer distances, and the ability to do complete chores at home.  (R. 995, 1010.)

The substantial weight of the evidence also supports the ALJ's findings that, although experiencing varying levels of pain during the period in question, plaintiff had largely unremarkable examination findings.  For example, in a physical therapy report from February 11, 2011, records indicate that despite reporting radiating pain, plaintiff was independent in all activities of daily living and self-care, she exhibited normal gait, and her fine motor skills were intact.  (R. 800.)

In a follow up visit after her first facet joint block treatment, the examiner observed plaintiff had grossly normal neurological functioning, full motor strength, and normal tone and gait.  (R. 717.)

An examination on January 13, 2012 found plaintiff had a mild muscle spasm, but she exhibited full motor strength, grossly normal neurological findings, and normal tone, gait, and balance.  (R. 686-87.)

In a March 2012 physical therapy session, plaintiff again reported radiating pain. (R. 398.)  However, the medical records reported plaintiff maintained full motor strength, denied sensory complaints, and could walk on her heels and toes.  (R. 398.)  She reported pain at a level three out of ten and reported independence in all activities of daily living and self-care. (R.  398.)

An examination on June 20, 2012 found plaintiff was in no acute distress, maintained full motor strength, and had good balance. (R. 678-79.)

On a visit to the pain clinic on November 9, 2012, despite reporting joint and muscle stiffness, plaintiff's examination revealed normal neurological testing, full motor strength, and normal, tone, gait, and balance. (R. 1009-10.)

In an examination on December 22, 2012, plaintiff reported experiencing pain relief for almost one year after receiving her last epidural steroid injection (R. 995.). The examination found plaintiff had full motor strength, grossly normal sensation, normal gait and balance, and no spinal tenderness. (R. 994.)

Treatment notes show plaintiff's condition remained stable for the first half of 2013.  In a checkup visit on May 1, 2013, plaintiff reported her pain was controlled since her last procedure in December.  (R. 1042.)  The examination revealed full motor strength, grossly normal neurological findings, and normal gait and tone.  (R. 1041-42.)  Her pain was controlled on medication and she was instructed to follow up in four months. (R. 1042.)

For all of these reasons, substantial evidence supports the ALJ's RFC findings that plaintiff responded well to treatment and had largely unremarkable exam findings.

c.   The ALJ Afforded Proper Weight to the Treating Physician

In the questionnaire completed on September 23, 2013, Dr. Ashraf opined that plaintiff had a "marked" limitation in the use of her hands for fine manipulation, as well as grasping, turning, and twisting objects.  (R. 1070.) The ALJ properly gave little weight to Dr. Ashraf's opinions because they are they are inconsistent with the substantial evidence of the record.  Plaintiff's medical records consistently demonstrate she had full motor strength and grossly normal neurological and sensational findings. (R. 678, 686, 717, 800, 994, 1009, 1041-42, 1055.) In the September 23, 2013 questionnaire, Dr. Ashraf opined that plaintiff could only sit for two hours and stand or walk for two hours (for a total of four hours of activity) during an

eight-hour work day, and that she would likely be absent from work more than three times per

month.  (R. 1069, 71.)  Dr. Ashraf failed to indicate what evidence she relied on in reaching

these conclusions.

The ALJ also properly considered the length and frequency of Dr. Ashraf's

treatment when determining the weight of her opinion.  Treating physicians are generally given

greater weight because they provide "a detailed, longitudinal picture" of the plaintiff's medical

impairments.  20 C.F.R § 416. 927(c)(2).  Dr. Ashraf submitted two disability questionnaires

assessing the plaintiff's impairments. (R. 1031- 37, 1067-71.)  By the time Dr. Ashraf completed

the second questionnaire, she had only treated the plaintiff for a total of one year, and she

reported these visits only occurred every six months.  (R. 1067.)  In the September 23, 2013

questionnaire, Dr. Ashraf opined that plaintiff could only sit for two hours and stand or walk for

two hours during an eight-hour work day, and that she would likely be absent from work more

than three times per month.  (R. 1069, 71.)  However, the ALJ concluded these restrictions held

little weight because of the infrequent and limited nature of Dr. Ashraf's care.  Indeed, the

limited medical records from plaintiff's visits with Dr. Ashraf fail to indicate Dr. Ashraf could

provide a "detailed, longitudinal" picture of the plaintiff's impairments.

As for the credibility of Dr. Revan, the consultative physician, the ALJ accepted

her detailed internal medicine examination findings as credible, but granted limited weight to the

more restrictive opinions expressed in the disability form completed by Dr. Revan. For instance,

in the detailed examination findings, Dr. Revan stated the plaintiff had no limitations with upper

extremities and only mild limitations for walking, standing, and sitting.  (R. 1055.)  However, on

the disability form, the doctor checked boxes that indicated plaintiff could only sit for two hours,

stand for two hours, and walk for two hours during an eight-hour work day, and that she must

alternate positions every thirty minutes.  (R. 1059.)  The ALJ reasoned that the doctor's detailed

examination findings were consistent with the overall record, while the disability form lacked

sufficient explanation and contained some careless mistakes.  (R. 23).

When the ALJ presented the vocational expert with a hypothetical person with

plaintiff's age, education, and work experience, he included the more restrictive limitations from

Dr. Revan's disability form, including that the person could only sit, stand, or walk for a total of

six hours in an eight-hour work day, and that the person must alternate positions every thirty

minutes.  (R. 40.) Since the vocational expert opined that a person with these qualities and

limitations could still work as plaintiff's previous job as a cashier or in other jobs available in the

national economy, the ALJ's perceived distinctions between Dr. Revan's detailed exam notes

and the boxes checked in the disability form are inconsequential.

The ALJ also correctly ignored the Morrisania form completed on May 17, 2012

that stated the plaintiff was "unemployable."  Such a statement is a conclusion of law and is

reserved for the Commissioner.

Finally, before the Appeals Council's decision, plaintiff's council raised the issue

that the hypothetical presented to the vocational expert included the ability to *occasionally* stoop,

kneel, and crouch (R. 40), but the ALJ's final RFC determination excluded all stooping,

kneeling, and crouching.  (R. 19.)  While the job of laundry sorter requires occasional stooping,

the remaining occupations identified by the vocational expert do not. Therefore, this distinction

does not affect the finding that plaintiff could perform her previous job as a cashier or the jobs

remaining jobs identified by the vocational expert.

d.   The Court Defers to the ALJ's Credibility Findings

The ALJ gave limited credibility to the plaintiff's testimony regarding her

limitations after weighing plaintiff's testimony in the context of the medically determinable

evidence. In doing so, the ALJ correctly applied the necessary two-step credibility analysis.

First, the ALJ considered the plaintiff's medical records and determined plaintiff suffers from a

back disorder that qualifies as a severe impairment.  (R. 16.)

Second, the ALJ considered to what extent the plaintiff's statements and

testimony regarding her symptoms could reasonably be accepted as consistent with the objective

medical evidence. The ALJ appropriately considered the plaintiff's testimony regarding her

levels of pain against the medical records that demonstrated plaintiff's condition improved with

treatment including medication, physical therapy, and injections.  (R. 330-32, 398, 405, 407, 413,

415, 687, 750, 995, 1010, 1042, 1053.)  The ALJ also considered plaintiff's testimony about her

daily activities against the medical records supporting her ability to care for personal needs, care

for her young daughter with some assistance, perform some chores, visit friends and attend

church, and use public transportation. (R. 323-27, 332, 398, 484, 680, 788, 800, 812, 995, 1047.)

Finally, the ALJ weighed plaintiff's testimony that she has used a cane for the past two years,

despite medical records that consistently reported she had no gait problems and did not use an

assistive device. (R. 34-35, 407, 410, 686, 744, 767, 801, 807, 812-13, 833, 835, 837, 839, 846,

856, 880, 994, 1007, 1009, 1041, 1054, 1059.)

The ALJ was in the best position to measure plaintiff's credibility, and his

credibility findings are supported by the evidence of record. Thus, the ALJ's credibility findings

are free from legal error, and this Court defers to his conclusions regarding the credibility of plaintiff's testimony.

    e.   <u>The Additional Evidence Submitted to the Appeals Council Is Irrelevant</u>

        The plaintiff submitted medical records as evidence to the Appeals Council after the ALJ issued his opinion.  (R. 60-165.)  These medical records pertain to plaintiff's condition and medical procedures after the ALJ's decision on November 15, 2013. (R. 2.)  Evidence generated after the time of the ALJ's decision may be material in a DIB claim if the new evidence strongly suggests that, during the relevant time period, the plaintiff's condition was far more serious than previously thought and that additional impairments existed. <u>Pollard v. Halter</u>, 377 F.3d. 183, 193 (2d. Cir. 2004).

        In this case, the evidence submitted by plaintiff demonstrates her condition worsened after the ALJ decision and she eventually underwent surgery on February 21, 2014 to treat a disc herniation at L5-S1. (R. 76-77.) However, the MRI report from January 7, 2014 stated the herniation and degenerative disc desiccation at L5-S1 was a new development that had not previously appeared on any earlier MRI's.  (R. 149.)  As a result, these medical records pertaining to the period after the ALJ's decision do not establish that plaintiff's condition was far more serious than originally thought, nor do they establish that plaintiff suffered from additional impairments during the relevant time period. The Appeals Council, therefore, correctly excluded the new evidence submitted by plaintiff.

## V. <u>CONCLUSION</u>

        The ALJ's findings are free from legal error and supported by substantial evidence.  The Commissioner's decision is affirmed. The Clerk shall enter judgment for the defendant.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
September 9, 2016